575 F.2d 378
 Armando MONTANO, Gilberto Gerena Valentin and Jose Melendez
on their own behalf, and on behalf of all others
similarly situated, Plaintiffs-Appellants,
v.
Louis J. LEFKOWITZ, Attorney General of the State of New
York, Hugh Carey, Governor of the State of New York,
Salvatore Sclafani, Herbert J. Feur, Alice Sachs, Charles A.
Avarello, Elrich A. Eastman, Elizabeth A. Cassidy, Matteo
Lumina, Joseph J. Previte, Anthony Sadowski and James Bass,
Commissioners of the Board of Elections in the City of New
York, as members of, and constituting the said Board of
Elections, Democratic Committee of Bronx County by Joseph L.
Galiber, its Chairman and Agnes L. Jones, its Treasurer,
Patrick J. Cunningham, Individually and as Chairman of the
Executive Committee of the Democratic Committee of Bronx
County, Bronx County Committee of the Conservative Party of
New York State by George McGuinness, its Chairman, the Bronx
County Committee of the Liberal Party by Nicholas Gyory, its
Chairman and Sydney Burnstein, its Treasurer, and the Bronx
County Republican Committee by John Calandra, its Chairman,
Respondents.
 No. 735, Docket 78-7033.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 24, 1978.
Decided April 6, 1978.
 
 John C. Klotz, New York City, for plaintiffs-appellants.
 Theodore Teah, New York City (Paul A. Victor and Stanley Schlein, New York City, of counsel), for respondent Democratic Committee of Bronx County.
 Mark Friedlander, New York City (Herzfeld & Rubin and Herbert Rubin, New York City, of counsel), for respondent Bronx County Committee of the Liberal Party.
 Before FRIENDLY, MULLIGAN and MESKILL, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This action in the District Court for the Southern District of New York, wherein federal jurisdiction exists on the basis of 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) and (4), stemmed from the resignation of Representative Herman Badillo of the 21st Congressional District (CD) on January 1, 1978 and the consequent need for the Governor of New York to call a special election to fill the vacancy.
 
 
 2
 Plaintiffs are all registered voters residing in the 21st C.D. Plaintiffs Montano and Melendez, enrolled in the Democratic party, brought the action on their own behalf and on behalf of all other similarly situated enrolled Democrats.[1] Plaintiff Gerena Valentin, whose political affiliations are not stated in the complaint, sued on behalf of himself and of other registered voters. The complaint alleged that under § 6-114 of the New York Election Law each political party could nominate a candidate to fill the vacancy in such manner as the party rules prescribed and that each of the four defendant political parties had delegated this power to the Executive Committee of the party Committee for the county in which the congressional district was located. The Executive Committees of the Democratic, Liberal and Conservative parties for Bronx County, in which the 21st C.D. is located, are constituted in the manner described in the margin;[2] the method for selecting the Executive Committee of the Bronx County Republican Committee is alleged to be similar but is not specifically described. The complaint alleged that nomination of candidates for Congress by the Executive Committees of the County Committees violated the principle of one man, one vote more accurately, of one Democrat (or Liberal, etc.), one vote in that the nominators included members of the Executive Committee who had been elected at large by the county committees, to wit, the officers, and also members who represented constituencies, to wit, assembly districts, within the county but outside the 21st C.D. Moreover, there was no weighting of the votes of members to reflect the strength of the respective parties in the various districts. Complaint was also made that an independent candidate who would have six weeks to obtain the 2,138 signatures required for nomination as a representative in the 21st C.D. had only 12 days to do this for a special election.[3]
 
 
 3
 Early in January 1978 plaintiffs moved for a temporary injunction against the conducting of the nomination procedure. The moving affidavit of plaintiffs' counsel contained, inter alia, in addition to the facts alleged in the complaint, a description of the ethnic and social conditions in the 21st C.D. and in Bronx County generally. It stated that the dominant groups in the 21st C.D. were black and Hispanic and that, although such groups were believed to constitute a majority of the entire county, the other four Congressional districts lying wholly or partly within it were so arranged that whites predominated. The 21st C.D. is located in the South Bronx, an area of profound social decay. These conditions of decay, portrayed in some detail, were alleged to have "aggravate(d) the normal patterns of low voting registration and political participation characteristic of minority groups. . . ." In contrast, other areas in Bronx County have large middle-class populations that are predominantly white, with high voter registration and election participation. Only seven of the twelve assembly districts in Bronx County lie wholly or partly in the 21st C.D., and in three of these seven the proportion of the assembly district within the 21st C.D. and of the 21st C.D. in the assembly district was exceedingly small. The result of this was that a combination of assembly district leaders from districts having no or little connection with the 21st C.D. and members of the Executive Committee chosen at large could determine the nomination for the 21st C.D. irrespective of the wishes of the leaders of the assembly districts that were truly representative of the Congressional District.
 
 
 4
 An opposing affidavit of the Chairman of the Bronx County Committee of the Liberal Party, also Chairman of its Executive Committee, stated, inter alia, that in designating a candidate for a special election to fill a vacant congressional seat, the county executive committee always seeks a proposed designation from members who have been elected from election districts within the congressional district; that the designee so proposed has invariably been designated by the Executive Committee; and that it was the intention to continue this custom. Despite this the committee opposed judicial imposition of this practice. An affidavit by the Secretary of the Democratic County Committee signified willingness to adopt a resolution, if ordered by the court,[4] which would modify the nominating procedures for the February 14 special election so that the nomination would be made solely by leaders of assembly districts within the 21st C.D., each casting a vote equal to the number of enrolled Democrats in the portion of his assembly district contained within the 21st C.D. While, in view of the district court's ruling, the Democratic Committee did not effect this rule change, an affidavit filed by the Secretary in this court states that, after hearing statements from candidates at the nominating session, the Executive Committee recessed while the leaders of districts within the 21st C.D. caucused and balloted in the manner set forth in the proposed resolution, and that the Executive Committee, by a large majority, endorsed the caucus' choice. However, when asked at argument, counsel declined to agree that future nominations would be conducted in accordance with the proposed resolution.
 
 
 5
 In a considered opinion, rendered with extraordinary speed, Judge Haight denied the temporary injunction for reasons that will appear in the course of our discussion. Plaintiffs appealed to this court on January 12,1978. Although the appeal was expedited, the election was held on February 14, 1978, ten days before the appeal was heard, and the successful candidate has now been seated in the House of Representatives.
 
 
 6
 We must deal first with the question whether the appeal has thereby become moot. It is true that since the district court merely denied temporary relief and no such relief can now be given, see Grimes v. Commonwealth of Kentucky, 462 F.2d 1359, 1361 (6 Cir. 1972), a reversal on this specific point would accomplish nothing. But an appellate court has the power, on review of a denial of a temporary injunction, to consider the case on the merits and decide whether the complaint states a claim on which relief can be granted. See Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 494-95, 20 S.Ct. 708, 44 L.Ed. 856 (1900); Deckert v. Independence Shares Corp., 311 U.S. 282, 287, 61 S.Ct. 229, 85 L.Ed. 189 (1940); Aerojet-General Corp. v. American Arbitration Association, 478 F.2d 248, 252-53 (9 Cir. 1973); Ballas v. Symm, 494 F.2d 1167, 1170-71 (5 Cir. 1974); 16 Wright & Miller, Federal Practice and Procedure § 3921, at 17 (1977). Although in most of the cases where this course has been followed the appellate court has ordered the complaint to be dismissed, such a procedure is also appropriate in the converse situation at least where, as here, no material facts are contested, the lower court has considered the merits in detail, and these have also been argued here. The only result of our finding the interlocutory appeal moot would be that the complaint would be dismissed and that decision would be successfully appealed to this court. To "save the parties from further litigation" we should therefore "proceed to consider and decided the case upon its merits," Mast, Foos & Co., supra, 177 U.S. at 494, 20 S.Ct. at 712, unless a ruling on the entire complaint, with its requests for declaratory and permanent injunctive class relief, has also become moot.
 
 
 7
 It plainly has not. Precedent clearly establishes that neither the Liberal and Democratic parties' voluntary adoption of the nomination procedures for the February 14, 1978 election that have been described above, Gray v. Sanders, 372 U.S. 368, 376, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), nor the holding of the election and the seating of the successful candidate, moots this appeal, see Gray v. Sanders, supra, 372 U.S. at 375-76, 83 S.Ct. 801; Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); Grimes v. Commonwealth of Kentucky, supra, 462 F.2d at 1361. Special elections for Congress will recur. As this case illustrates, the very speed with which such elections must be conducted makes the problem of constitutional defects in nomination procedures peculiarly one "capable of repetition, yet evading review," Southern Pacific Terminal Co. v. I. C. C., 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). See generally Dunn v. Blumstein, 405 U.S. 330, 333 n. 2, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Rosario v. Rockefeller, 410 U.S. 752, 765 n. 5, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973); contrast Brockington v. Rhodes, 396 U.S. 41, 90 S.Ct. 206, 24 L.Ed.2d 209 (1969).[5] We therefore turn to the merits.
 
 
 8
 This court addressed the problem of the composition of county committees in Seergy v. Kings County Republican Committee, 459 F.2d 308 (2 Cir. 1972). We there dealt with a procedure with respect to such committees authorized by then § 12 of the New York Election Law. This provided that a county committee could be constituted in one of two ways. One was by the election of two members from each election district within the county, with the voting power of each member in proportion to the party vote in his district. The other allowed the election of up to two additional members from each election district; under this option, which the Kings County Republican Committee had exercised, each member had one vote with the result that election districts having few Republican registrants would have the same vote as those with more. We held that this was permissible insofar as it concerned "votes taken by the county committee in the conduct of its internal party affairs which have no direct relation to the electoral process"; on the other hand "(i)n those rare instances where committeemen perform public electoral functions (e. g., the nomination of candidates to fill vacancies or to run in special elections, or the giving or (sic) consent to candidacies by non-members of the party), however, the county committee is required by the Equal Protection Clause to apply the 'one-man, one vote' principle, since in such cases it is unquestionably playing an integral part in the state scheme of public elections." In Lynch v. Torquato, 343 F.2d 370 (3 Cir. 1965) (Hastie, J.), the court had reached the same conclusions with respect to the inapplicability of "one-man, one vote" to non-electoral functions of a county committee and recognized, without deciding, that a different rule might apply to electoral ones.
 
 
 9
 Seergy is not so determinative in appellants' favor as they claim. While Seergy would require that the votes of the assembly district leaders be weighted,[6] the principal relief sought by appellants is that members of the executive committee having no connection with the 21st C.D. should have no voice in the nomination at all. Indeed, Seergy could be argued to be an authority against appellants rather than for them, since it seemed to assume that there was no constitutional impediment to designation by the county committee for nomination in a district smaller than the county if only the votes of representatives of all districts were properly weighted. However, examination of the briefs in Seergy shows that the legality of participation by persons outside the district was not argued.
 
 
 10
 We likewise find relatively little enlightenment in decisions of the Supreme Court relied upon by appellants except on the point, which appellees do not seriously contest, that New York's delegation to the various parties of the right to nominate candidates for special elections, Election Law §§ 6-114, 6-116, 6-156, renders the party selection process state action. See, e. g., Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Developments in the Law Elections, 88 Harv.L.Rev. 1111, 1155-63 (1975).[7] Gray v. Sanders, supra, 372 U.S. 368, 83 S.Ct. 801, heavily relied upon by appellants, held only that in a state primary for the nomination of a United States Senator and statewide officers, Georgia could not employ a "county unit" system which produced enormous disparity between the value of a vote in the more and the less populous counties; the statement from Mr. Justice Douglas' opinion quoted in the margin[8] must be read in this context. Moore v. Ogilvie, supra, 394 U.S. 814, 89 S.Ct. 1493 (1969), also dealt with nomination to statewide offices. On the other hand, Cousins v. Wigoda, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975), does not afford the precedent for affirmance which appellees assert. The case dealt with a narrow question, namely, whether the Appellate Court of Illinois "was correct in according primacy to state law over the National Political (Democratic) Party's Rules in the determination of the qualifications and eligibility of delegates to the Party's National Convention," 419 U.S. at 483, 95 S.Ct. at 545. In deciding that the Appellate Court of Illinois had indeed erred, Mr. Justice Brennan inserted a long footnote detailing questions, more nearly pertinent to the problem in this case, which the Court was not deciding, 419 U.S. at 483-84 n. 4, 95 S.Ct. 541.
 
 
 11
 We likewise find scant help in decisions of other courts of appeals. While Grimes v. Commonwealth of Kentucky, supra, 462 F.2d 1359, relied on by appellants, was like this case in that it related to the nominating of a candidate in a special Congressional election by a party executive committee, the committee was composed solely of representatives of counties within the congressional district, and the claimed violation of the "one-man, one-vote" principle was that large counties had no greater vote than small ones and that the precincts which chose the county representatives were themselves malapportioned. Ripon Society v. National Republican Party, 173 U.S.App.D.C. 350, 525 F.2d 567 (1975) (en banc ), cert. denied, 424 U.S. 933 (1976), relied upon by appellees, is likewise not dispositive. That case, like Cousins, supra, dealt with the method of choosing delegates to a party's national convention. Judge McGowan did suggest that where an assembly does not exercise formal governmental powers "some other scheme of representation (may) outweigh the interests served by numerically equal apportionment," 173 U.S.App.D.C. at 363, 525 F.2d at 580; that "the interests they (political parties) advance by adopting representational schemes of their own choosing seem to us to be of great importance and of clearly constitutional stature," id. 173 U.S.App.D.C. at 364, at 581; and that "a party's choice, as among various ways of governing itself, of the one which seems best calculated to strengthen the party and advance its interests, deserves the protection of the Constitution as much if not more than its condemnation," id. 173 U.S.App.D.C. at 368, at 585 (emphasis in original). However, the holding was simply that there was no constitutional flaw in a system whereby the Republican party selected 72% of the delegates to its national convention in accordance with the electoral votes of the states and the remaining 28% on the basis of success in previous elections.[9]
 
 
 12
 Appellants' case when properly analyzed rests not only on the Equal Protection clause of the Fourteenth Amendment but also upon the clauses of the Constitution with respect to the election of the House of Representatives and action of Congress pursuant thereto. The relevant constitutional provisions are that "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States," "apportioned among the several States . . . according to their respective Numbers," that "When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies," Art. I, § 2, and that "The Times, Places and Manner of holding Elections for . . . Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . ," Art. I, § 4. Wesberry v. Sanders, 376 U.S. 1, 14, 84 S.Ct. 526, 533, 11 L.Ed.2d 481 (1964), makes clear that the apparent breadth of the power granted to state legislatures by Art. I, § 4, is not a carte blanche specifically that it does not permit them to "draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others." On a parity of reasoning, if Representatives were still "chosen as a group on a statewide basis, as was a widespread practice in the first 50 years of our Nation's history," 376 U.S. at 8, 84 S.Ct. at 530, it would be clear under Gray v. Sanders, supra, 372 U.S. 368, 83 S.Ct. 801, that nominations could not validly be made by a malapportioned state committee, convention or primary.
 
 
 13
 When Congress in 1842, in protest against this "general ticket system," first used its power "to make or alter" state regulations and required that elections to the House of Representatives should be by single-member districts of contiguous territory, 5 Stat. 491, see Paschal, The House of Representatives: "Grand Depository of the Democratic Principle"? 17 L. & Contemp.Prob. 276, 281 (1952), it signalled its belief that Representatives should be representative. See the remarks of Representative Campbell, the sponsor of the 1842 act, 11 Cong.Globe 445 (27th Cong. 2d Sess. 1842); remarks of Representative Carr, id. at 446. After many vicissitudes, highly interesting but unnecessary here to detail,[10] the substance of the 1842 statute was reenacted in 1967, 81 Stat. 581, 2 U.S.C. § 2c, with several sponsors echoing the views of their predecessors of 1842 with respect to the representative nature of Representatives.[11] While some lofty minds in the deprived 21st C.D. may share Edmund Burke's noble views of the duty of a representative,[12] most are doubtless more interested in their Representative's reflecting the opinions of a majority of the district, in obtaining federal funds for it, and in assisting constituents in dealing with the federal bureaucracy. See Bibby and Davidson, On Capitol Hill 7-8 (1972); Galloway, Congress at the Crossroads 11-12 (1946).
 
 
 14
 It seems to us to be implicit in the single-member district system for the election of Representatives that insofar as a state allows nomination to be made on an elective basis, it cannot constitutionally include in the electorate persons elected to a committee for the specific purpose of representing units in other districts. It is simply inconsistent with the concept of election of Representatives by districts that a candidate should be chosen in part by persons outside the district elected to these posts as such. It could not be seriously contended that a primary to chose nominees for the various congressional districts in a general election could validly be held on a statewide basis or, when a county contains several congressional districts, even on a countywide basis, with the victors assigned to the districts in some arbitrary fashion which might result, however strongly political considerations usually would otherwise dictate, in the nominee's being unresponsive to the desires of the voters in the district.[13] If the state provides a primary election to select party candidates for the House of Representatives, the voters in each district are entitled to participate in it on the same basis both of equality and of independence from other districts having possibly divergent interests that they enjoy in the election itself. See generally Cantwell v. Hudnut, 419 F.Supp. 1301, 1310-14 (S.D.Ind.1976); Note, Special Service Districts in a City-County Consolidation, 47 Ind.L.J. 101, 110 (1971).[14]
 
 
 15
 Appellants accept as they must that the exigencies of special elections for the House of Representatives do not afford time for a primary. It may well be that nomination for such special elections could validly be placed in persons previously chosen to constitute the party hierarchy in a unit which includes but is larger than the particular congressional district, or by some combination of such persons and delegates elected by the district, or with such persons having some kind of veto power over the candidate selected by the delegates of the district. We recognize, as Judge McGowan did in the Ripon Society case, supra, 173 U.S.App.D.C. at 368, 525 F.2d at 585, that the party itself has an interest in the choice of a candidate, and that arrangements other than designation solely by persons elected by the district to represent it on a county committee may be constitutionally permissible indeed that there may be a variety of constitutionally permissible methods. We do not face and do not decide those questions today. But we see no constitutional justification for including among the nominators for a member of the House of Representatives for a particular congressional district delegates to a committee chosen locally by independent units in the county which have no relationship to the congressional district where the election is to be held. It would hardly be argued that a nominee for a special election in the 21st C.D. in the South Bronx, with its predominately black and Hispanic population, could be validly selected by a statewide committee containing delegates elected by upstate communities or even by a New York City committee with delegates elected to represent that city's wide spectrum of ethnic and economic interests. We do not see why the matter stands differently in any legally significant way because the executive committees in this case were countywide rather than statewide or citywide.[15] The lack of any practical necessity for designation of a nominee for the House of Representatives in the manner here under attack is demonstrated by the resolution which the Democratic Bronx County Committee was prepared to adopt, by the procedure which it in fact followed, by the procedure which the Bronx Liberal party has used, and by Article V, §§ 3 and 4 of the New York County Democratic Committee rules which are set forth in the margin.[16]
 
 
 16
 We leave it to the district judge to frame an appropriate decree, after such hearings and conferences with the parties and with such experts as he deems desirable, although in light of what the parties have already proposed, such formal procedures may not be required. We emphasize again that we hold only that insofar as the nominators for members of the House of Representatives[17] include persons solely on the basis that they have been elected to represent constituencies in Bronx County, these must be constituencies which include portions of the Congressional district concerned; that when the constituency only partially overlaps with the Congressional district, some appropriate adjustment is required; and that the mandate of Seergy with respect to weighting must be met.
 
 
 17
 The judgment is reversed and the cause remanded for further proceedings consistent with this opinion. No costs.
 
 
 
 [1]
 Montano was also a candidate for nomination
 
 
 [2]
 The Executive Committee shall consist of the Chairman of the Executive Committee, Secretary and Treasurer of the County Committee, who shall each have two votes, and the Chairman and Vice Chairman of the County Committee, who shall each have one vote, and one male and one female Assembly District Leader from each full Assembly District, or part thereof, of Bronx County as it exists at the time of the biennial Primary Election, at which such Leaders are chosen. Every male and female Assembly District Leader of a full Assembly District shall each have two votes. Where an Assembly District has been divided into two or more parts, each male and female Assembly District Leader shall have an equal vote in proportion to the total votes allocated for the full Assembly District
 Democratic Party Rules, Article III.
 Section 1. (a) There shall be an Assembly District leader and associate assembly district leader in each assembly district in Bronx County. Such assembly district leader and associate assembly district leader shall be elected directly by the enrolled voters of the Liberal Party within each such assembly district, without regard to sex, biennially, at the Primary Election held in each even numbered year. Each assembly district leader and associate district leader shall be an enrolled voter of the Liberal Party residing within the assembly district from which he shall be elected.
 (b) The assembly district leaders and the associate assembly district leaders so elected at such primary election, together with the officers of the County Committee shall constitute the executive committee of the County Committee.
 Liberal Party Rules, Article IV.
 Section 1 Composition of the Executive Committee. There shall be an Executive Committee of the Bronx County Committee of the Conservative Party herein referred to as the Executive Committee which shall be separate and distinct from, and shall not be a subcommittee of, the County Committee. The Executive Committee shall be composed of the following:
 a. The Chairman, Vice Chairman, Secretary and Treasurer of the County Committee.
 b. The Chairmen of all Standing Committees of the County Committee as hereinbefore provided.
 c. The Assembly District Leaders of all Assembly Districts, with in Bronx County as hereinafter provided.
 d. The immediate past Chairman of the County Committee or Interim County Committee.
 e. Assembly District Administrators as hereinafter provided.
 Conservative Party Rules, Article VI.
 
 
 [3]
 This point, which is without merit for reasons well stated by Judge Haight, seems to have been abandoned on appeal
 
 
 [4]
 Such an order was thought to be necessary to avoid any infraction of the Voting Rights Act of 1965, 42 U.S.C. § 1973c
 
 
 [5]
 Judge Haight ruled that plaintiffs lacked standing to attack the rules of the Liberal, Conservative and Republican parties. We need not disturb this ruling since a decision with respect to the Democratic party will constitute a precedent with respect to the other parties
 
 
 [6]
 Judge Haight pointed out that this would work against the 21st C.D. rather than for it
 
 
 [7]
 In Ripon Society v. National Republican Party, 173 U.S.App.D.C. 350, 525 F.2d 567 (1975) (en banc ), cert. denied, 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976), the D.C. Circuit questioned but did not decide whether a national political party's allocation of national convention delegates constituted state action. Whether or not the D.C. Circuit confines such doubts to national delegate selection rules, we join with "most commentators" and "many lower courts" in holding that when the state grants political parties the right to nominate candidates and then gives those nominees special access to the ballot, compare Election Law §§ 6-114, 6-116, 6-156, with §§ 6-138, 6-142(2), 6-158(9), the parties' procedures constitute state action. Tribe, American Constitutional Law 788, 790 (1978). See Seergy v. Kings County Republican Committee, supra, 459 F.2d at 314; Grimes v. Commonwealth of Kentucky, supra, 462 F.2d 1359
 We do not believe that the Supreme Court's footnote in O'Brien v. Brown, 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972) (staying judgment of the Court of Appeals because of the "circumstances and time pressure surrounding" the case), a challenge to a delegate seating decision of the Democratic National Convention's Credentials Committee, to the effect that that case was not one "in which claims are made that injury arises from invidious discrimination based on race in a primary contest within a single State. Cf. Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944)," was intended to suggest an absence of state action in any political party case not involving race. See generally Cousins v. Wigoda, 419 U.S. 477, 483 n. 4, 95 S.Ct. 541, 42 L.Ed.2d 595(1) (1975) (declining to decide the "convention action as state action" question raised by O'Brien ).
 
 
 [8]
 Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment
 372 U.S. at 379, 83 S.Ct. at 808.
 
 
 [9]
 The rather complex formula is set forth in 173 U.S.App.D.C. at 353-54, 525 F.2d at 570-71
 
 
 [10]
 See, in addition to the Paschal article cited in text, Cong. Research Service, The Constitution of the United States of America: Analysis and Interpretation 109 (1973); H.R.Rep.No.191, 90th Cong., 1st Sess., at 3 (1967); Sen.Rep.No.291, 90th Cong., 1st Sess., at 9 (1967)
 
 
 [11]
 See Sen.Rep.No.291, 90th Cong., 1st Sess., at 28 (1967) (individual views of Senator Bayh). Senator Baker spoke on the Senate floor of affording "maximum protection of the rights of all people and maximum responsiveness to their needs." 113 Cong.Rec. 34365-66 (Nov. 30, 1967)
 
 
 [12]
 "Your representative owes you, not his industry only, but his judgment; and he betrays instead of serves you if he sacrifices it to your opinion." Speech to the Electors of Bristol, November 3, 1774, in Burke's Politics 115 (Hoffman & Levack eds. 1949)
 
 
 [13]
 Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965), in which the Supreme Court upheld a Georgia plan wherein state senators were elected at large from a multi-district county but each was required to live in a separate district within the county, is not to the contrary. The Court emphasized that under the Georgia system "it is not accurate to treat a senator from a multi-district county as the representative of only that district within the county wherein he resides. The statute uses districts . . . merely as the basis of residence for candidates, not for voting or representation. . . . (S)ince his tenure depends upon the county-wide electorate he must be vigilant to serve the interests of all the people in the county, and not merely those of people in his home district; thus in fact he is the county's and not merely the district's senator." Id. at 438, 85 S.Ct. at 501. See Dusch v. Davis, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967); Dallas County v. Reese, 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975). By contrast, the Representative from the 21st C.D. represents only that congressional district; he does not represent the entire county
 
 
 [14]
 This is not a case in which the "outsiders" who have been granted the right to vote with respect to a nominee for the district have some important link to the district, as in the case of commuters or of nonresidents owning property within the district. Such cases raise quite different issues. See generally Cantwell v. Hudnut, supra, 419 F.Supp. 1301. It is also worth noting that the problem here presented will not arise in what we would think to be the more usual case where there are several counties within one Congressional district, e. g., Grimes v. Commonwealth of Kentucky, supra, 462 F.2d at 1360 (21 counties in Kentucky's Sixth Congressional district); it occurs in heavily populated urban areas with more Congressional districts than counties
 
 
 [15]
 We are not impressed by the argument, Anderson v. Meisser, 285 F.Supp. 974, 975-76 (E.D.N.Y.1968), that any injury inflicted on the voters in the 21st C.D. by the participation of persons elected from other districts is compensated by the potential reciprocal ability of persons elected by voters in the 21st C.D. to inflict injury on the voters in other Congressional districts when, as and if special elections should be held there. Even if the ability to inflict such injury could make up for the dilution of one's vote, its occasion is totally fortuitous, depending as it does on the location and timing of future special elections, and the members of the 21st C.D. may never realize its potential
 
 
 [16]
 3. Nominations for Public Office. Whenever a Party nomination, other than a nomination required to be made at a primary election, is to be made for a public office to be filled at a general or special election (a) such nomination shall be made by the Executive Committee if for a public office to be filled by the voters of a political sub-division whose boundaries are coterminous with the boundaries of the County of New York or the Borough of Manhattan, and any vacancy in a nomination so made shall be filled by the Executive Committee or by a sub-committee thereof appointed by the Executive Committee for that purpose, and (b) such nomination shall be made by the appropriate District Committee if for a public office to be filled by the voters of a political sub-division wholly or partly contained within, but embracing only a part of, the County of New York or the Borough of Manhattan, and any vacancy in a nomination so made shall be filled by a sub-committee appointed by said District Committee for that purpose
 
 
 [4]
 Weighted Voting. Whenever a District Committee takes action with respect to a Party nomination for public office referred to in Article V, Section 3, or an authorization of a designation or nomination referred to in Article III, Section 5(b), of these Rules and Regulations, the voting power of each member shall be in proportion to the Democratic Party vote for Governor at the last preceding gubernatorial election in the Election District from which such member was elected, or in case the boundaries of any such district have been changed since the last preceding gubernatorial election in such manner that such vote for Governor cannot be determined, or in case any new Election District has been created since such election, in proportion to the Democratic Party vote cast for Member of Assembly in such district, as the case may be, or in the event there was no election for Member of Assembly subsequent to such change, then in proportion to the Party enrollment in such district at the last preceding general election; provided however, that in any case where a District Leader who is not otherwise a member of the County Committee is automatically a member of the County Committee pursuant to Section 15 of the Election Law and of a District Committee pursuant to Article I, Section 2(c) of these Rules and Regulations, the vote of any such District Leader in any such District Committee shall equal the smallest proportional vote allotted by the foregoing provisions of this section to any other member of such District Committee
 New York Democratic County Committee Rules, Article V.
 
 
 [17]
 We specifically do not deal with nominations for vacancies in state elective offices. Although, as we were warned at the argument, this question is bound to arise, it is not present in this case and our decision rests in considerable part on the provisions of the Constitution with respect to the election of Representatives and action by Congress pursuant to them