OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 We must decide whether the superintendent selection process established by New York City’s public schools chancellor impermissibly interferes with the statutory power of local community school boards to employ a community superintendent. We conclude that it does not.
 

 I.
 

 Under the Decentralization Law (Education Law art 52-A; L 1969, ch 330, as amended) supervision and control of New York City’s public schools is shared between an appointed, seven-member central Board of Education (city board) and 32 local community boards, whose members are elected by the parents and registered voters within each community district (Education Law § 2590-b [1] [a]; § 2590-c [1], [3];
 
 see, James v Board of Educ.,
 
 42 NY2d 357, 364-365). Community board jurisdiction is generally limited to schools below the high school level within their district (Education Law § 2590-e) while the city board generally controls the high schools and citywide programs
 
 (see,
 
 Education Law § 2590-g [9], [12]; § 2590-h [1]). As we have observed, friction between the city board and community boards "arise[s] quite naturally” because the statutes defining their respective spheres of power tend to "overlap and breed conflict”
 
 (Matter of New York City School Bds. Assn. v Board of Educ.,
 
 39 NY2d 111, 117).
 

 The chief administrative officer of each local district is the community superintendent, while the chief administrator of the city board is the chancellor (Education Law § 2590-a [5],
 
 *511
 
 [6]; §§ 2590-f, 2590-h), empowered to suspend or remove community board members for failure to comply with rules or directives (Education Law § 2590-/ [1]). Each community board is specifically authorized to "[e]mploy a community superintendent,” subject to the chancellor’s minimum education and experience requirements (Education Law § 2590-e [1] [a]; § 2590-j [2]).
 

 Against this statutory backdrop, in January 1990, shortly after assuming office, Chancellor Joseph A. Fernandez issued Special Circular No. 37, whose stated purpose was "to improve the ability of all community school boards to evaluate the qualifications of candidates for community superintendent and to assure that only the most highly qualified individuals are selected.” The circular was divided into four parts.
 
 [1]
 

 Part I, which is not in controversy, requires that all "official actions” of a community school board be taken by resolution adopted at a public calendar meeting. Examples include the decision to expend funds for advertising an opening and the final decision to hire a specific individual.
 

 Part II, captioned "Selection Process,” requires each community board to develop, and approve at a public meeting, the procedure by which its superintendent will be selected. The process must include a screening committee to establish selection criteria, review resumes and conduct interviews. While the circular suggests that a cross section of interested persons be appointed to the committee — principals, teachers, union representatives, parents — the only mandated constituents are representatives of the parent associations. In addition, the community board members themselves may serve on the screening committee.
 

 The screening committee must prepare written recommendations of at least four candidates for the board’s consideration. If none of those candidates are satisfactory, the board must file a written explanation with the screening committee and the chancellor, and request additional names from the committee.
 

 Part III, the "Chancellor’s Review of Selection Process and Candidate Evaluations,” is triggered when the board has narrowed the field to a minimum of one and a maximum of three finalists. The board must prepare and submit to the
 
 *512
 
 chancellor a comprehensive evaluation of each finalist measured against detailed educational, managerial and administrative criteria set forth in the circular. As part of its report to the chancellor, the board must also demonstrate that each finalist meets the board’s own selection criteria and that the candidate’s background and character have been investigated. Part III additionally provides:
 

 "Within fifteen working days of receiving the community school board’s materials, the Chancellor will provide the school board with his assessment of the selection process, including the selection criteria, the evaluations and whether the community school board has applied the selection criteria/evaluation factors to the candidates.
 
 If the Chancellor determines that the actions of the community school boards are flawed or deficient, in any way, he will so advise the community school board and issue appropriate directives. ”
 
 (Emphasis added.)
 

 Finally, Part IV addresses the renewal of an incumbent superintendent’s contract, and provides that if the board is considering that action, it must consult with the district’s parent associations, and in addition to preparing a full evaluation of the employee, submit to the chancellor a summary of the parents’ views. As in Part III, the chancellor will review and assess the renewal process and "issue appropriate directives.”
 

 At its February 15 public meeting, the board of Community School District No. 29 resolved, by a seven-to-two vote, not to comply with the circular. The board had apparently prepared an evaluation of its incumbent superintendent and planned to renew his contract without input from the chancellor. In March the chancellor wrote to the board’s president directing that before contract renewal the evaluation be submitted for his approval, concluding: "I will not hesitate to utilize all the authority vested in me pursuant to
 
 Education Law 2590-l
 
 to ensure compliance with this directive, it is so ordered.”
 

 Thus threatened with removal, the board sought a judgment in Supreme Court declaring Special Circular No. 37 invalid and unenforceable. Several other community school districts intervened in the proceeding seeking similar relief. In a written decision, Supreme Court agreed with the community boards that the chancellor exceeded his statutory powers, and declared the circular invalid (147 Misc 2d 1010).
 

 
 *513
 
 On the chancellor’s appeal the Appellate Division unanimously reversed, concluding that the circular was within the chancellor’s powers. We agree.
 

 II.
 

 Resolution of the issues before us is aided by a brief review of the history of the Decentralization Law.
 

 The Legislature had long provided for a community voice in educational affairs through local school boards
 
 (see,
 
 Education Law former § 2564, repealed by L 1962, ch 615, § 1) but until the advent of decentralization, these boards had no significant power
 
 (see,
 
 Education Law former § 2564 [4]; Comment,
 
 New York City School Decentralization: The Respective Powers of the City Board of Education and the Community School Boards,
 
 5 Fordham Urb LJ 239, 242 [1977]).
 

 In 1962, the Legislature enacted a new Education Law § 2564 which provided that the city board of education "may” divide the city district into local school board districts and appoint respective local boards to serve at the city board’s pleasure (L 1962, ch 615, § 1 [repealing Education Law § 2564]; § 3 [adding new Education Law § 2564]). The statute further specified that
 

 "The [city] board of education shall have the power to determine the powers and duties of such local school boards,
 
 which shall be advisory only
 
 and shall be determined in such a manner as to allow the maximum possible participation by the people of the city of New York in the affairs of the city school system.” (§ 2564 [former (3)]; emphasis added.)
 

 Thus, while the Legislature took steps toward diffusion of power, the creation of local boards was optional with the city board, the local boards were to be "advisory only,” and their constituency was terminable at the city board’s will
 
 (see, Matter of Ocean Hill-Brownsville Governing Bd. v Board of Educ.,
 
 23 NY2d 483, 485-487).
 

 In 1967, the Legislature found that "[increased community awareness and participation in the educational process is essential to the furtherance of educational innovation and excellence in the public school system” (L 1967, ch 484, § 1) and directed New York City’s Mayor to prepare a comprehensive report and formulate a plan for the creation of local
 
 *514
 
 "educational policy and administrative units” with "adequate authority”
 
 (id.,
 
 § 2). In response, the city board set up three experimental "demonstration” districts
 
 (see, Matter of Ocean Hill-Brownsville Governing Bd. v Board of Educ.,
 
 23 NY2d 483, 486,
 
 supra).
 

 Committed to a "community oriented approach” to the "urban educational challenge,” the Legislature the following year directed the city board to prepare a plan for the development of a citywide community school system (L 1968, ch 568, § 1). This legislation was, in effect, the blueprint for the Decentralization Law later adopted
 
 (compare,
 
 the provisions in L 1968, ch 568, § 1,
 
 with
 
 L 1969, ch 330, § 4).
 

 The 1968 legislation, moreover, provided certain interim decentralization measures. The provision that the city board "may” divide the city into local districts was amended to state that the city board "shall” do so (L 1968, ch 568, § 4 [amending Education Law § 2564 (1)]. While the statute had originally provided local boards only with advisory powers, the Legislature authorized the city board, with the approval of the Board of Regents, to delegate to the local boards "any or all of its functions, powers, obligations and duties in connection with the operation of the schools and programs under its jurisdiction” (Education Law § 2564 [3]).
 

 Most significantly for present purposes, the amendments to Education Law § 2564 also provided local boards with a specific power:
 

 "In accordance with rules and regulations to be promulgated by the board of education, each such local school board shall have the power to employ a local superintendent of schools upon such terms and conditions as such local school board shall determine” (Education Law § 2564 [4]).
 

 The balance struck between the city board and community boards with respect to this specific power is the focus of the particular issues before us, to which we now turn.
 

 III.
 

 As adopted in 1969, the Decentralization Law provided a broad grant of power to the community boards — to be exercised consonant with the provisions of article 52-A and the
 
 *515
 
 policies established by the city board — and some specific powers, including the power to employ a superintendent:
 

 "§ 2590-e. Powers and duties of community boards "Each community board shall have
 
 all the powers and duties,
 
 vested by law in, or duly delegated to, the local school board districts and the board of education of the city district on the effective date of this article,
 
 not inconsistent with the provisions of this article and the policies established by the city board,
 
 with respect to the control and operation of all pre-kindergarten, nursery, kindergarten, elementary, intermediate and junior high schools and programs in connection therewith in the community district. The foregoing shall not be limited by the enumeration of the following, each community board shall have the power and duty to:
 

 "1. a.
 
 Employ a community superintendent
 
 by contract for a term not to exceed by more than one year the term of office of the community school board authorizing such contract, subject to removal for cause, at a salary to be fixed within the budgetary allocation therefor, subject to the provisions of [section 2590-j (2)] of this article.” (Emphasis added.)
 

 A question of statutory interpretation immediately arises: must exercise of the enumerated powers and duties be "[ Consistent with * * * the policies established by the city board,” or is that requirement limited solely to the broad grant of authority in the preamble? The answer was suggested in
 
 Matter of New York City School Bds. Assn. v Board of Educ.
 
 (39 NY2d 111,
 
 supra):
 
 "Significantly, by the preamble to section 2590-e the powers of the community boards are made subject generally to the policies established by the city board.”
 
 (Id.,
 
 at 119 [considering the powers enumerated in Education Law § 2590-e (2) to (4)].) This reading of the statute, moreover, as it applies specifically to employment of community superintendents, is fortified by the immediate predecessor to section 2590-e (1), which required that superintendent hiring be "[i]n accordance with rules and regulations to be promulgated by the board of education” (Education Law § 2564 [4]).
 

 Thus, we conclude as a matter of statutory interpretation that the community boards’ hiring practices must conform to
 
 *516
 
 the city board’s policies,
 
 [2]
 
 and reject the community boards’ contrary contention that the only limitation on the hiring power is the chancellor’s right to set minimum education and experience standards.
 

 We recognize, of course, the danger that a city board policy could effectively eliminate a power granted by the Legislature to the community board. Plainly, a policy that eviscerates a community board’s enumerated power to hire a superintendent — a power not expressly shared by the city board — would not comport with legislative intent underlying the Decentralization Law. Moreover, in light of the special significance the Legislature attached to having local boards select their own superintendents, evident in the fact that such power was granted even before the Decentralization Law, particular vigilance must be paid to assuring sufficient autonomy by community boards in this respect.
 

 We are satisfied, however, that neither the concept nor the specific terms of Special Circular No. 37 significantly intrude upon the community boards’ power to employ a superintendent.
 

 Supreme Court analogized the circular to the environmental review process mandated by SEQRA (ECL art 8), where an agency is required to take a "hard look” at the various alternatives before acting
 
 (see, e.g., Matter of Jackson v New York State Urban Dev. Corp.,
 
 67 NY2d 400, 417). Not unlike the SEQRA process, which is designed to assure that actions materially affecting the environment are taken only after due consideration, the concept of a thorough candidate review process is designed to assure that the selection of a superintendent is made after full consideration of the various candidates’ qualifications. In the abstract, such a procedure does not affect the boards’ hiring authority.
 

 Nor do the terms of this circular impermissibly encroach upon the community boards’ power. Indeed, the requirement that representatives of parent associations serve on the screening committee is consistent with the history of the Decentralization Law, which is replete with legislative expression that the community should participate in decisionmaking at the local level.
 

 Finally, the community boards argue that in reserving the
 
 *517
 
 power to review the selection process and issue "appropriate directives,” the chancellor has effectively granted that office a veto power over the choice of community superintendent. The posture of this case, however, presents solely a facial challenge to the circular; no exercise of "directive” authority is challenged here. We thus leave for future resolution the determination whether the chancellor is using the power of that office to assure adherence to the procedural mechanisms of the circular — which would be permissible — or whether he is effectively substituting his judgment for the community boards’ on the merits of a particular candidate.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Judges Simons, Titone, Hancock, Jr., Bellacosa and Smith concur.
 

 Order affirmed, with costs.
 

 [1]
 

 . The chancellor issued a slightly revised Special Circular No. 37 in March, and that version is before us on this appeal.
 

 [2]
 

 . The community boards do not contend that the chancellor lacks authority to set city board policy consistent with law and actual city board policy
 
 (see,
 
 Education Law § 2590-h [17]).