**Thomas BROCK, Plaintiff,**

v.

**Stephen SANDS, Objector, and Douglas Kellner, Paul Mejias, Vincent Velella, Kathleen Wagner, Weyman Carey, Seymore Sheldon, Gertrude Strohm, Ferdinand Marchi, Ronald D'Angelo and Frederick Umane, Commissioners constituting the Board of Elections in the City of New York, Defendants.**

**No. 96 CV 1572 (FB).**

United States District Court,
E.D. New York.

April 27, 1996.

John N. Ciampoli, Garden City, NY, for Plaintiff.

Paul A. Crotty, Corporation Counsel of the City of New York by Patricia Le Goff, Assistant Corporation Counsel, New York City, for Defendants Board and Commissioners.

Nicholas J. Miglino, New York City, for Defendant Sands.

## AMENDED MEMORANDUM AND ORDER

BLOCK, District Judge:

Plaintiff Thomas Brock ("Brock") brings this civil rights action pursuant to 42 U.S.C. § 1983 seeking declaratory and injunctive relief regarding the constitutionality of certain aspects of the nominating process used in New York City community school board elections. Presently before this Court is Brock's motion brought by order to show cause for a preliminary injunction requiring defendant Board of Elections of the City of New York and the individual commissioners ("Board of Elections") to place his name on the ballot in the upcoming May 7th election as a candidate for one of nine positions on the community school board of District Number 24. Both the Board of Elections and the objector Stephen Sands ("Sands") oppose Brock's motion for injunctive relief and the Board of Elections has moved to dismiss the complaint for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On April 19, 1996, the Court heard oral argument on the motions and reserved decision. Brock's motion is granted and the Board of Elections' motion is denied.

## BACKGROUND

Section 2590–c of New York's Education Law ("Education Law"), and certain portions of New York's Election Law ("Election Law") which the Education Law incorporates, govern New York City community school board ("community school board") elections. Sections 2590–c(1) and (2) of the Education Law provide for nine positions on a community school board, all positions being filled simultaneously and at-large every three years. To gain access to the ballot, an individual must gather 200 signatures on nominating petitions. N.Y.Educ.Law § 2590–c(6)(a)(2). Nominating petitions must be filed with the Board of Elections at least four weeks prior to the election. N.Y.Educ.Law § 2590–c(6)(a)(1). Moreover, as incorporated from the Election Law, each nominating petition must be "witnessed" by an individual who swears to having observed each signature on the petition. N.Y.Educ.Law § 2590–c(6)(a); N.Y.Elec.Law. §§ 6–132(2), (3), 6–140(1)(b), (2). As represented by the parties at oral argument, approximately 161,000 individuals are currently eligible to vote in a community school board election in District Number 24.

Brock filed a nominating petition containing a total of 275 signatures with the Board of Elections. Brock's petition was subsequently challenged by Sands, who submitted various objections to the Board of Elections. On April 1, 1996, the Board of Elections invalidated eighty-six (86) of the 275 signatures. Sixty-six (66) are here at issue.[1] The Board of Elections invalidated one of these 66 signatures because the signer had previously signed another candidate's nominating petition. More significantly, the Board invalidated sixty-five (65) signatures because the witnesses of these signatures had previously signed nominating petitions for other candidates.[2] Brock's petition was thereby rendered inadequate because it fell short of the required 200 signatures. The parties agree that if the Board erred in invalidating these

65 signatures, Brock would qualify to be placed on the May 7th ballot. Brock thereafter sought relief in this Court.

## DISCUSSION

■ To witness a particular nominating petition under the Election Law, an individual must be qualified to sign the petition itself. As sections 6–132(2), (3) and 6–140(1)(b), (2) of the Election Law provide:

[§ 6–132] 2. There shall be appended at the bottom of each sheet a signed statement of a witness who is a duly qualified voter of the state and an enrolled voter of the same political party as the voters qualified to sign the petition, and who is also a resident of the political subdivision in which the office or position is to be voted for ...

3. *In lieu of the signed statement of a witness who is a duly qualified voter of the state qualified to sign the petition*, the following statement signed by a notary public or commissioner of deeds shall be accepted ...

[§ 6–140] 1.b. There shall be appended at the bottom of each sheet a signed statement of *a witness who is a duly qualified voter of the state and who also is qualified to sign the petition* ...

2. *In lieu of the signed statement of a witness who is a duly qualified voter of the state qualified to sign the petition*, the following statement signed by a notary public or commissioner of deeds shall be accepted ...

N.Y.Elec.Law §§ 6–132(2), (3) and 6–140(1)(b), (2) (emphasis added). Although the Education Law is silent with respect to witness qualification, these provisions of the Election Law are incorporated by section 2590–c(6)(a) of the Education Law. *See La-velle v. Gonzalez*, 93 A.D.2d 896, 461 N.Y.S.2d 433, 434 (2d Dept.), *aff'd*, 59 N.Y.2d 670, 450 N.E.2d 218, 463 N.Y.S.2d 412 (1983) ("Education Law renders the Election Law

---

1. The reasons for the invalidation of the other twenty (20) signatures were as follows: seventeen (17) were not registered to vote; one (1) had no date or an incomplete date; one (1) did not list an election district; and one (1) was a duplicate signature. (Compl. at Ex. A.)

2. These witnesses were Norman L. Guile, who had signed the nominating petition for Frank Borzellieri, and Steven R. Yuen, who had signed the nominating petition for Katherine R. Masi.

applicable with respect to nominations of candidates for community school boards. Sections 6–132 (subs. 2, 3) ... and 6–140 (subds. 1, 2) of the Election Law ... require a subscribing witness to be qualified to sign the petition he or she carries.").

The Election Law and the Education Law, however, contain different, specific provisions governing the number of petitions that an otherwise qualified individual may sign. Under the Election Law, a qualified individual is not precluded from signing as many nominating petitions as there are positions to be filled. Section 6–134(5) of the Election Law provides:

> If a voter shall sign any petition or petitions designating a greater number of candidates for public office or party position than the number of persons to be elected thereto his signatures, if they bear the same date, shall not be counted upon any petition, and if they bear different dates shall be counted in the order of their priority of date, for only so many designees as there are persons to be elected.

N.Y.Elec.Law § 6–134(5). For example, if there is only one position to be filled in a particular election, an otherwise qualified individual can sign no more than one candidate's nominating petition and, if he or she does so, only the earlier dated signature can be counted. *See, e.g., Lavelle,* 93 A.D.2d at 896, 461 N.Y.S.2d at 434 ("Where a qualified voter signs more than one petition for the same office, subdivision 5 of section 6–134 of the Election Law commands that only the earlier dated signature be counted and, where those signatures bear the same date, that neither signature be counted."). If, however, there are nine positions to be filled, nothing precludes an otherwise qualified individual from signing all nine candidates' petitions.

■ Section 6–134(5) of the Election Law, however, *does not apply in community school board elections.* Although section 2590–c of the Education Law incorporates much of the Election Law, it expressly precludes a qualified individual from signing more than one candidate's nominating petition even though there are several positions to be filled. Section 2590–c provides in pertinent part as follows:

> 6. Applicability of the election law. (a) The provisions of the election law with respect to nomination of candidates, declination of nominations, filling of vacancies in nominations, notices to candidates, objections to petitions, rulings thereon, judicial proceedings, campaign receipts and expenditures and all other matters so far as applicable shall govern the election of community board members; provided however that ...
>
> . . . .
>
> (3) each candidate shall be nominated by a separate petition and *no elector shall sign more than one such petition. Should an elector sign more than one such petition, his signature shall be void except upon the petition first signed.*

N.Y.Educ.Law §§ 2590–c(6)(a)(3) (emphasis added). Thus, an individual can sign no more than one nominating petition in a community school board election even though there are nine positions to fill in each election. If an individual has previously signed a candidate's nominating petition, his or her signature on another candidate's nominating petition will not be counted.

*The number of petitions that an individual can sign will thus affect the number of petitions that an individual can witness* since a witness must be qualified to sign the petition that he or she is witnessing. At first glance, it might appear that an individual cannot witness a greater number of petitions than there are positions to be filled. On the contrary, there is no limitation on an individual's ability to witness several candidates' nominating petitions, even when only one position is to be filled, if that individual has not already signed any candidate's petition. *See Bergmann v. Berger,* —— A.D.2d ——, 631 N.Y.S.2d 183, 184 (2d Dept.1995) ("However, there is *no similar statutory provision* pertaining to a person acting as a subscribing witness after previously serving as a subscribing witness on petitions of another candidate for the same office, and there are no clear public policy reasons for precluding a person from witnessing the designating peti-

tions of competing candidates."). This is because the individual, having not signed any petition, remains qualified to sign each petition. But where, for example, an individual signs a candidate's nominating petition and there is only one position to be filled, that witness is precluded from later witnessing another candidate's nominating petition since, having already signed a petition, the individual would not be qualified to sign the other candidate's petition which he or she seeks to witness. *Id.* ("It is well settled that a person may not be a subscribing witness to a petition after having signed a valid designating petition of another party for the same office."); *see Signorelli v. New York State Bd. of Elections,* No. 95–CV–1026, 1995 WL 548712 at *8 (N.D.N.Y. Sept. 11, 1995) ("For the purposes of the case at bar, only registered voters enrolled in the Republican party who had not already signed the designating petition of another candidate for the same office were eligible to serve as subscribing witnesses."). Thus, the effect of section 2590–c(6)(a)(3) with respect to witnesses in a community school board election is to prevent an individual from *witnessing* any nominating petition if he or she has *signed* any candidate's petition.

■ Brock challenges these provisions of the Education Law and the Election Law insofar as they operated to invalidate 66 signatures contained on his nominating petitions. Although it is unclear whether Brock alleges that these provisions violate his or the voters' rights, the Court does not distinguish between the two, recognizing that " 'the rights of voters and the rights of candidates do not lend themselves to neat separation[.]' " *Burdick v. Takushi,* 504 U.S. 428, 434, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992). The gravamen of Brock's constitutional challenges are as follows: First, Brock argues that the application of section 2590–c(6)(a)(3) in community school board elections violates the Equal Protection Clause because there is no similar limitation in most other elections. *See supra* N.Y.Elec.Law § 6–134(5). Second, Brock argues that section 2590–c(6)(a)(3) violates his rights under the First Amendment and Fourteenth Amendment Due Process Clause by placing an undue burden on his access to the ballot.

■ Faced with these constitutional challenges, the Court must first determine whether to apply a strict scrutiny or a rational basis analysis in evaluating the challenged provisions. *Burdick,* 504 U.S. 428, 112 S.Ct. 2059. In deciding whether to apply a strict scrutiny or rational basis inquiry, a court must initially consider whether the limitations contained in section 2590–c(6)(a)(3) "severely" burden either the candidate's or the voters' First and Fourteenth Amendment rights since only "[t]hose regulations that impose 'severe' restrictions 'must be narrowly drawn to advance a state interest of compelling importance.' " *Schulz v. Williams,* 44 F.3d 48, 56 (2d Cir.1994) (quoting *Burdick,* 504 U.S. at 434, 112 S.Ct. at 2063). "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick,* 504 U.S. at 434, 112 S.Ct. at 2063 (quoting *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547 (1983)); *see Rockefeller v. Powers,* 74 F.3d 1367, 1377 n. 16 (2d Cir.1996) ("*Rockefeller I* ") ("In *Burdick,* the Court took [its statement in *Norman v. Reed,* 502 U.S. 279, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992) ] ... that a restriction must be 'severe' to merit strict scrutiny, and extended it to all claims that the fundamental right to vote has been burdened.").[3] The court should follow a "totality approach" in evaluating the weight of the burden imposed by the challenged provision, including a consideration of New York's overall election scheme. *Schulz,* 44 F.3d at 56.

**3.** In *Rockefeller I,* the Second Circuit raised the uncertainty regarding the appropriate standard to apply to an election provision challenged on equal protection grounds. 74 F.3d at 1377–78 n. 16. Like the Second Circuit, the Court does not here decide the precise standard to be applied since, as in *Rockefeller I,* this Court concludes that the requirements imposed by the challenged provisions "do not even 'significantly' burden the plaintiff's [or the voters'] fundamental right to vote." *Id.*

■ The Court concludes that the limitation imposed by section 2590–c(6)(a)(3) on the number of petitions that an individual may sign and thus, witness, does not severely burden either Brock's or the voters' constitutional rights. The burden imposed by section 2590–c(6)(a)(3) with respect to the facts of this case is to require a candidate (1) to obtain 200 signatures from eligible voters who have not already signed another candidate's petition, and (2) to ensure that the otherwise qualified individual witnessing those signatures has not already signed the petition of another candidate. This burden is slight considering that a candidate has a pool of over 161,000 eligible voters from which to obtain the requisite signatures and witnesses. For purposes of illustration, assume that forty candidates obtained an average of 300 signatures, eliminating 12,000 eligible voters from the nominating pool. Even with the reduced pool, a prospective candidate would be required to·obtain signatures from approximately only .1% of the remaining pool of eligible voters (*i.e.,* 200 out of 149,000 eligible voters). This minimal percentage alone is sufficient to distinguish the signature requirements here from the 5% or 1250 requirement in *Rockefeller v. Powers,* 917 F.Supp. 155 (E.D.N.Y.1996) (Korman, J.) (finding unconstitutional the ballot access provisions for the State's Republican presidential primary), *aff'd, Rockefeller v. Powers,* 78 F.3d 44 (2d Cir.1996) ("*Rockefeller II* ").

Judge Korman's decision in *Rockefeller II* is additionally distinguishable based on the difference between presidential primaries and local elections. Judge Korman commented on this distinction stating:

[I]t should be noted that a presidential primary requires a kind of campaign that is very different from an ordinary campaign for local office. In a national presidential campaign, ballot access restrictions that require enormous outlays of money and manpower will lead candidates to concentrate their resources in other states where the return on their investment, measured in terms of potential delegates and national exposure, will be greater per dollar spent. Thus, to prevent candidates from competing in a certain state, the state legislature need not adopt access restrictions that are, in the abstract, insurmountable. Instead, it need only adopt restrictions that are substantially more burdensome than those adopted in other states.

*Id.,* 917 F.Supp. at 159. Here, unlike in a presidential primary, a candidate focuses all of his or her campaigning efforts in a single district.

The Court also finds it significant that the Education Law departs from the Election Law in respects other than the petition signing limitation here at issue. The Education Law's 200 signature requirement is itself an exception to the Election Law, which would require more signatures in almost every other election. *See, e.g.,* N.Y.Elec.Law §§ 6–136, 6–142. Moreover, the Education Law has expanded the pool of eligible voters in a given district by including parents whose children are enrolled in the school district, N.Y.Educ.Law § 2590–c(3)(a), thus decreasing the overall burden on the candidate. *See Coalition for Educ. in Dist. One v. Board of Elections,* 370 F.Supp. 42, 46 (S.D.N.Y.1974), *aff'd,* 495 F.2d 1090 (2d Cir.1974) (explaining "parent voters" provision).

Because the Court concludes that the limitation imposed by section 2590–c(6)(a)(3) on the number of petitions that an individual can sign and thus, witness, in a community school board election is not severe, the "State need not establish a compelling interest to tip the constitutional scales in its direction." *Burdick,* 504 U.S. at 439, 112 S.Ct. at 2066. Instead, the Court need only find a rational basis for the legislative scheme here at issue. In making this inquiry, the Court sees no need to here prescind between Equal Protection and First Amendment/Fourteenth Amendment Due Process analysis. *See, e.g., Anderson,* 460 U.S. at 787 n. 7, 103 S.Ct. at 1569 n. 7.

■ As an initial matter, the Court notes that it does not "sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations[.]" *Heller v. Doe,* 509 U.S. 312, 319, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993). Indeed, courts

[N]ever require a legislature to articulate its reason for enacting a statute, [and] it is

entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.... In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.

*Federal Communications Comm'n v. Beach Communications, Inc.,* 508 U.S. 307, 315, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993).

■ Defendant Sands has provided such rational speculation with respect to the limitation on the number of nominating petitions an individual may sign. As he states in his supporting papers:

In order to insure that community school board elections were non-partisan and not subject to the ordinary influences of the political election process the legislature set up an independent, non-partisan system for electing school board members.

. . . .

[T]he state legislature made several significant charges [sic] in the petition process [*e.g.,* three-year simultaneous terms which rarely coincide with other elections; enlarged pool of eligible signers; low number of signatures required; supplying candidates with petition forms and cover sheets] to provide the broadest possible participation by the greatest number of people in school board elections. They set about making it easier than usual as well as isolating community school board elections from the partisan political process. They wanted to insure a "level playing filed" [sic] and prevent involvement by the organized political parties as well as "special interest" groups such as unions, vendors and professional associations.

. . . .

The legislatures' purpose and rationale was to prevent the typical and usual practice of "slate making." That is, several candidates (in school board elections as many as nine) joining together on a single petition sheet. Thus, a voter is presented with a "slate" the creation of which he had

no control over and must sign for all or for none. .

(Aff.Opp. to Order to Show Cause Seeking Prelim. Inj. at 2–4.); *cf. Fletcher v. Marino,* 882 F.2d 605, 607 (2d Cir.1989) (discussing decentralization involved in the creation of community school board scheme); *Board of Education of Community School Dist. No. 29 v. Fernandez,* 81 N.Y.2d 508, 514, 618 N.E.2d 89, 92, 601 N.Y.S.2d 56, 59 (1993) (same). The Court concludes that these justifications provide a rational basis for the limitation on the number of petitions an individual can sign in a community school board election.

These justifications, however, do not provide a rational basis for disqualifying an individual from serving as a witness in a community school board election. In response to the Court's inquiry at oral argument, Sands' counsel stated that the rationale for precluding a witness from signing another individual's petition was to ensure the integrity of the nominating process. Thus, an individual who has signed a petition for one candidate cannot arguably be trusted to properly witness another candidate's petition because of the inherent divided loyalty in furthering the candidacy of two or more candidates for one position. Although this may provide a rational basis for the limitation on witnesses in single-position elections, it is not persuasive where, as here, there are at-large positions to be voted upon. In community school board elections, the signing of a petition for one candidate and the witnessing of up to eight petitions for different candidates does not implicate concerns about the integrity of the nominating process because an individual can vote for nine candidates. No rational justification has been offered by the defendants for disqualifying such a witness merely because he or she signs another candidate's petition, whether before or after serving as a witness, and the Court, after considerable reflection, cannot conceive of one.

Thus, the Court holds that in a community school board election, a voter cannot be precluded from signing a nominating petition for one candidate and witnessing the petitions for up to eight other candidates. Accordingly, there is no basis to trample upon the

rights of those who signed Brock's petition to vote for the candidate of his or her choice or to deprive Brock from being their candidate.

### *CONCLUSION*

The Court determines that Brock has demonstrated a clear likelihood of success on the merits. *See Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996). The Board of Elections shall place his name on the ballot for the May 7th election. Accordingly, the Court grants Brock's motion for a preliminary injunction and denies the Board of Elections' motion to dismiss.

**SO ORDERED.**