*41 OPINION OF THE COURT
George Friedman, J.
Petitioners seek an order pursuant to CPLR article 78 setting aside a directive of the respondent Chancellor dated August 12, 1996, which purported to annul the petitioner local Community School Board’s (Community School Board 12, hereinafter CSB12 or the Board) selection of Alex Castillo as community superintendent, and directed petitioners to reconvene and select a new community superintendent.
Stated in the most fundamental terms, the issue which must now be resolved is whether the respondent Chancellor may "veto” the selection of a community superintendent of a local school district. While the selection itself is to be made by the local body, it cannot be disputed that the process is governed by uniform practices, procedures, and standards promulgated by the Chancellor. Here, after the local Community Board had narrowed the field to two candidates, all the while acting in close cooperation with the Chancellor’s office, the Board selected a community superintendent, only to be advised by the Chancellor that the Board’s candidate was "unqualified”. The Chancellor directed the selection of the other finalist, and subsequently suspended the Board based upon their refusal to comply with his direction.
For the reasons set forth below, the court concludes that the Chancellor may not exercise a "veto power” over the selection process of a community superintendent by the expedient of claiming that the local School Board has "violated its own selection criteria,” or that the person chosen by the Board is "unqualified”.
Facts
The selection of a community superintendent must be made in accordance with Special Circular No. 37, promulgated by the Chancellor, pursuant to which procedures are set forth providing for, among other things, the establishment of a screening committee, the promulgation of criteria for evaluation and the submission of evaluations of the finalists to the Chancellor. With respect to the selection process, the circular provides:
"Once formed, the Screening Committee will develop selection criteria for candidates. Selection criteria may include the candidate’s demonstration of his/her ability to:
"^establish and manage effective educational programs in accordance with laws, regulations and contracts;
*42 "*manage and control budgets and resources; and
"^supervise, support and develop pedagogical and non-pedagogical staff.
"These are only examples of selection criteria; the Screening Committee is required to formulate its own criteria and to indicate which criteria are mandatory (minimum) and which are preferred (optimum). Those criteria shall be considered for adoption by the community school board. When criteria are adopted the resolution must reflect which criteria are mandatory and which are preferred.”
Evaluations of the finalists must be submitted to the Chancellor for review. Those evaluations must be undertaken in accordance with specified criteria, as set forth below:
"A. Educational Effectiveness
"Community school boards must consider the indicators set forth in the School and/or District Summary Profiles as a part of their evaluations. These indicators include:
"*performance of a school or district against the Chancellor’s Minimum Standards;
"*annual performance on state and city wide tests of reading, mathematics and writing achievement;
"*pupil attendance;
"*the participation and achievement of Limited English Proficient (LEP) students in bilingual programs; and
"^performance of special education students.
"The community school board may identify other evaluation factors appropriate to the unique needs of the community.
"Consideration should also be given to other information contained in the profiles, such as student demographics, student mobility, staff longevity and experience, etc.
"In addition, the community school board should consider the finalists’ demonstrated effectiveness in such areas as curriculum development, staff development, compliance with instructional mandates, safety and disciplinary proceedings, and parent involvement * * *
"As part of each evaluation report, the community school board must demonstrate the following:
"1. That the candidate meets the community school board’s selection criteria;
"2. That the community school board has investigated the background and character of the candidate, including the verification of references; and
*43 "3. The basis on which the community school board has determined the candidate’s effectiveness as an educator, manager and administrator. For example, provide an explanation of how the community school board determined that the candidate has effectively managed and controlled budgets and resources, including interviews, review of documents, budgets, etc.”
Pursuant to Circular No. 37, CSB12 had adopted selection criteria, including one standard calling for "demonstrated effectiveness * * * in the achievement of improved annual student performance on State and Citywide tests of reading, mathematics and writing achievement”. The requirement that a candidate for community superintendent demonstrate effectiveness in improving scoring on standardized tests is merely one listed criteria out of seven mandatory (i.e., minimum) factors adopted by CSB12:
"selection criteria
"mandatory
"1. Demonstrated Satisfactory Teaching Experience:
"3-5 years minimum in a classroom setting.
"2. Evidence of success in the area of management and administration, ability to manage and control budgets (tax-levy/reimbursable) and resources in cost-effective manner in accordance with Mandates of Central, State and/or Federal Agencies at the school or district level.
"3. Evidence of on-going professional development within the past 3 years.
"4. Demonstrated effectiveness during the past five years in a school or district position in the achievement of improved annual student performance on state and citywide tests of reading, mathematics, and writing achievements.
"5. Evidence of ability to develop and maintain interpersonal relations, rapport, and communication with parents, community, and staff at school or district level.
"6. Experience in alternative and innovative curriculum program design and successful implementation of parent/ community involvement programs at the school or district level.
"7. Evidence of direct responsibility for, and achievement of a successful or improved pupil attendance program at a school or district level.”
*44 Dismayed that as of June 1996, CSB12 had allegedly made little progress in selecting a superintendent, the Chancellor met with Community School Board 12 on June 20, and became actively involved in the selection process. After various false starts, CSB12 was directed to meet with the Chancellor on July 9, and to appoint a temporary superintendent.
At the July 9 meeting, the Chancellor received the impression that he and CSB12 had agreed to "jointly select” the new superintendent. It is not disputed that Deputy Chancellor Judith A. Rizzo met with CSB12 on July 17, and reviewed the resumes of six candidates, agreeing on those who would be granted interviews. By July 24, the Board had narrowed the field to two candidates, Alexander Castillo, the principal of PS101 in District 4 (Manhattan), and Mary Rivera, the principal of PS154 in District 7 (the Bronx).
The Chancellor advised the president of CSB12 that in his opinion "the best qualified” person was Ms. Rivera. His opinion was based on statistical analysis of the performance of the respective schools headed by each. The Chancellor pointed out that PS154 met minimum standards in 9 out of 10 areas, whereas PS101 met those standards in only 2 out of 9 areas. In 1995, PS154 scored 64.3% of students at grade level in mathematics, whereas PS101 scored 23.8%. In reading, both schools were below both the national and City averages — PS154 at 33.9% and PS101 at 23.9%.
Based upon the Board’s failure to complete the selection process by July, its alleged abrogation of an agreement to make a "joint selection”, and its alleged "disregard for [its] own criteria,” the Chancellor suspended the Board and appointed temporary trustees.
Discussion
The role of the Chancellor’s office in overseeing a local Community School Board’s selection of a superintendent was recently considered by the Court of Appeals in Board of Educ. v Fernandez (81 NY2d 508). At issue in that case was the Chancellor’s authority to issue Special Circular No. 37, with which the local School Board, in renewing its incumbent superintendent’s contract, had refused to comply. Threatened with suspension, the local School Board sought and obtained a declaration from Supreme Court that the promulgation of Special Circular No. 37 exceeded the Chancellor’s statutory authority and was thus invalid.
The Appellate Division reversed. Agreeing with the Appellate Division’s conclusion, the Court of Appeals reviewed the *45 history of the Decentralization Law (Education Law art 52-A; L 1969, ch 330). The Court noted in particular that in 1968, prior to enacting the Decentralization Law, the Legislature had enacted certain interim decentralization measures:
"Most significantly for present purposes, the amendments to Education Law § 2564 also provided local boards with a specific power:
" 'In accordance with rules and regulations to be promulgated by the board of education, each such local school board shall have the power to employ a local superintendent of schools upon such terms and conditions as such local school board shall determine’ (Education Law § 2564 [4])” (Board of Educ. v Fernandez, 81 NY2d, supra, at 514).
Observing that a Community Board is specifically vested with the authority to hire a community superintendent pursuant to Education Law § 2590-e (1) (a), the Court of Appeals nevertheless held that such grant of authority is circumscribed by the Chancellor’s right to promulgate uniform standards and policies:
"A question of statutory interpretation immediately arises: must exercise of the enumerated powers and duties be '[ ] consistent with * * * the policies established by the city board,’ or is that requirement limited solely to the broad grant of authority in the preamble? The answer was suggested in Matter of New York City School Bds. Assn. v Board of Educ. (39 NY2d 111, supra): 'Significantly, by the preamble to section 2590-e the powers of the community boards are made subject generally to the policies established by the city board.’ (Id., at 119 [considering the powers enumerated in Education Law § 2590-e (2) to (4)].) This reading of the statute, moreover, as it applies specifically to employment of community superintendents, is fortified by the immediate predecessor to section 2950-e (1), which required that superintendent hiring be '[i]n accordance with rules and regulations to be promulgated by the board of education’ (Education Law § 2564 [4]).
"Thus, we conclude as a matter of statutory interpretation that the community boards’ hiring practices must conform to the city board’s policies, and reject the community boards’ contrary contention that the only limitation on the hiring power is the chancellor’s right to set minimum education and experience standards” (Board of Educ. v Fernandez, 81 NY2d, supra, at 515-516).
The Court of Appeals cautioned, however, that the right to set uniform goals, policies, and procedures must not be *46 employed by the Chancellor as a subterfuge to usurp the Community Board’s prerogative to employ a community superintendent of its own choosing. In holding that the provisions of Special Circular No. 37 did not encroach on the local School Board’s authority, the Court nevertheless observed: "We recognize, of course, the danger that a city board policy could effectively eliminate a power granted by the Legislature to the community board. Plainly, a policy that eviscerates a community board’s enumerated power to hire a superintendent — a power not expressly shared by the city board — would not comport with legislative intent underlying the Decentralization Law. Moreover, in light of the special significance the Legislature attached to having local boards select their own superintendents, evident in the fact that such power was granted even before the Decentralization Law, particular vigilance must be paid to assuring sufficient autonomy by community boards in this respect” (Board of Educ. v Fernandez, 81 NY2d, supra, at 516).
The Court specifically left for future consideration the issue now squarely presented in the case before this court — i.e., whether the Chancellor could employ the mechanisms of Special Circular No. 37 to exercise "veto power” over the selection process: "Finally, the community boards argue that in reserving the power to review the selection process and issue 'appropriate directives,’ the chancellor has effectively granted that office a veto power over the choice of community superintendent. The posture of this case, however, presents solely a facial challenge to the circular; no exercise of 'directive’ authority is challenged here. We thus leave for future resolution the determination whether the chancellor is using the power of that office to assure adherence to the procedural mechanisms of the circular — which would be permissible — or whether he is effectively substituting his judgment for the community boards’ on the merits of a particular candidate” (Board of Educ. v Fernandez, 81 NY2d, supra, at 516-517).
The court must now resolve that issue as it applies to the present facts. This court observes that the Chancellor’s office has specifically requested that the Legislature grant it a veto power over the selection of community superintendent, and that the Legislature declined to do so (Report of Temp St Commn on New York City School Governance, Apr. 1991). The Legislature’s refusal to further expand the Chancellor’s authority in this regard stands as a reaffirmation of the principle that such local autonomy is a basic tenet of the concept of decentrali *47 zation (see, Matter of Community School Bd. Nine v Cortines, 160 Misc 2d 995).
Discussion
At the outset, the court observes that throughout his answer, and repeatedly at oral argument, the Chancellor has asserted that CSB12 has "violated its own selection criteria” in choosing a superintendent. The Chancellor’s allegation is that CSB12 has ignored the requirement that the candidate demonstrate effectiveness in improving student scores or testing.
Initially, the Chancellor has not established that Alex Castillo has not improved scores over the past five years. It may be that the present scores of the school headed by Mr. Castillo, while below City averages, have improved over the course of the previous five years’ time.
In any event, standardized testing is but one of seven criteria which must be evaluated. This single factor may not be relied upon by the Chancellor to "veto” the selection of Mr. Castillo for the simple reason that Ms. Rivera’s school also falls below the City’s norms in the area of reading scores. Clearly these scores are but one factor to evaluate where no candidate has established either (1) demonstrated improvement over a course of years, or (2) that present scores on both mathematics and reading meet City averages.
The next argument advanced by the Chancellor is that CSB12 reneged on an agreement to make a "joint” selection with the Chancellor. The court finds that such an agreement, assuming that one existed, is unenforceable. Clearly, the responsibility and authority to select a superintendent rests with the Community School Board. The entire legislative scheme requires local authority in these areas. For a local School Board to cede its duties to the Chancellor contravenes the Legislature’s intent and violates the offices of those persons elected to represent this local school district. Any purported agreement which would delegate to the Chancellor the authority vested in the local School Boards, and granted to the electorate, must be found violative of public policy.
It is this court’s conclusion, after hearing extensive argument, that the Chancellor was simply dissatisfied with the choice made by CSB12, or personally rankled at CSB12’s apparent last minute decision to make a final determination without first obtaining the advice and consent of the Chancellor — as parenthetically, the Board was free to do. Whatever the Chancellor’s motivation, it is evident that he has decided, *48 improperly, to substitute his discretion for that of CSB12. It is hardly thinkable that the Chancellor’s office, which was initially involved in the selection process, would have permitted an unqualified person to become one of two finalists for the position at issue as a courtesy. Simple logic dictates that, on the contrary, there was no question that Mr. Castillo was a qualified candidate, and that the Chancellor’s present posture is mere pretext.
It may be that certain school districts perform in a substandard way, and that serious measures are necessary to rectify the problem. The Chancellor states in his affidavit that, "I was concerned that they [CSB12] did not have the wherewithal to address the pressing educational needs of CSB12 children”. It may be that the Chancellor is better qualified to select the superintendent, or that his choice is more logical or sound. The Legislature, however, has resoundingly rejected these conclusions. As the Court of Appeals observed in Board of Educ. v Fernandez (supra), a policy which eviscerates a Community School Board’s power to hire a superintendent cannot be sanctioned. The Chancellor, as this court, is bound to conform to the will of the Legislature, and may not substitute his wisdom for theirs.
There exist other grounds to set aside the Chancellor’s determination. The Chancellor did not seek reconciliation pursuant to Education Law § 2590-l before he suspended the Board. It is disingenuous to argue, as he does, that the course of dealing here was tantamount to conciliation — i.e., that the Chancellor sought conciliation prior to the time that the dispute arose. The argument defies common sense. In addition, the United States District Court has held that the Chancellor must seek "preclearance” under the Voting Rights Act of 1965 (42 USC § 1973c) before suspending elected Community School Board members, which the Chancellor concededly failed to do.
For these reasons, the petition is granted, the directive of August 12 is annulled and the respondents are permanently enjoined from suspending CSB12 based upon its decision to employ Alex Castillo as superintendent.